Your Honor, Brian Michaels here, appearing on behalf of Ms. Mims, plaintiff in this matter. The first issue I will address is the first claim in the complaint, and that would be the First Amendment claim. According to the District Court's order on this issue, a municipality is granted broad, unbridled discretion to use its police force in an impressive and intimidating way in order to suppress what it sees as disfavored speech. This is quite contrary to what we know to be of the First Amendment jurisdiction's prudence. A municipality may not look toward the content of speech, either in a permitting scheme or in the use of force. Well, as I read the record, the only suggestion, the only thing that even hints of that is the fact that they prepared a contingency plan. Well, I think what hints at it in a very strong way is that they mobilized an extremely large force of well-armed officers to an event. Well, yes, in view of indication that there might be a need for maintaining order. And I don't understand what that has to do with the First Amendment. It's just a sensible law enforcement response that was mobilized off-site and was only going to be called if, as it turns out, there was a need. I think the record shows that there was, in this case, Officer Shadwick, the other defendant, was part of that force to which Your Honor refers. But there were several other officers present. They were in riot gear. They were intimidating and arresting in a very violent way members of this council. I had trouble with the inference. Long before I was a judge, I participated in some demonstrations. A lot of us did. And there were often a lot of police. And the ones I participated in, we all behaved ourselves, and the police wound up being kind of a fancy escort. If anyone had attacked us, they would have protected us. No doubt, if we had gotten out of hand, they would have arrested us and protected the other people. In this case, it looks to me as though you just can't draw an inference from a lot of cops, except they're ready for anything. And what you need is to show that the arrest and knocking the woman over were an intent to shut her up. And that I had trouble with. The cop is reacting to something on fire being thrown at the police. And the woman steps in front of him. And maybe it's just an accident she steps in front of him. But he says, geez, I thought she's trying to block me from getting at whoever threw the fire. I don't see how you can draw a bad inference about speech. Well, so help me with the record. Sure. You know better than I do. I take some exception to the characterization that she stepped in front of him. I think a jury could certainly infer that when officers run into a crowd at night with no light, at top speed, chasing an individual with a baton twirl, with a baton being shaken at that individual, it's not unlikely that they would run into someone. This is an extremely negligent act on the part of these police officers. OK, let's say it is. OK. Let's say it is. It's still. That's not enough for you. It's not a negligence case. You've got to show an intent to shut her up. I understand. But I believe that by the content of this speech, these police officers were trained and set up to look at these people as second-class citizens. If you read the affidavits of how five other individuals were arrested and how three of those arrests were thrown out as having been without cause, these were violent, brutal, unnecessary takedowns in front of a crowd for apparently no reason. At best, it was for a jaywalking. At best, if you take the police at their word, and three of those were thrown out because it was found not to be jaywalking, this develops a pattern that based on the content of their speech, they were viewed as second-class citizens. So when these officers ran through this crowd, and not some… Wait. Did they have a parade permit? Well, none of the officers disagreed with that. There was no gathering without marching without a permit issued, citation issued. And frankly, if you want to issue citations for marching without a parade permit, you don't need riot gear. You can do it with meter maids. But, in fact, they did not have a permit issue, and no one was ever arrested or ticketed for that. But when you run into a crowd when you're chasing a suspect, and you happen to knock someone down, if you treat that person as an equal, you will help them up and apologize. That's not what this officer did. This officer not only did not do that, but arrested this woman, and then claimed that she moved in front of him. She didn't go to him. He came to her at full speed. And if you read the record, he's focusing entirely on hitting his suspect with his baton, and he doesn't even know whether or not he hit the suspect with the baton. He is so certain about what she did, but his entire testimony is totally focused on his suspect. I think what you have is somebody who, because he's a policeman, would take him for his word, but when someone is accused of something, they will tend to make up a story to excuse themselves. And there's no evidence that he was at all paying attention to her movements. He was running through a crowd. It's not unlikely when you run through a crowd at high speed with no light at night you're going to run into someone. The record will show that the person he ran into happened to be a middle-aged woman with fibromyalgia. If this is fibromyalgia, it's someone that's in extreme pain all the time. The likelihood of somebody in that physical condition moving in front of a running officer is absurd. But yet he makes this story up. Just like he made this story up that the crowd was ordered to disperse before he got there, and therefore he could arrest her for disorderly conduct, again trying to defend his actions. When, in fact, the city stipulated an oral argument, and it's in the excerpts of record, that there was no order to disperse prior to him arresting Ms. Mills. So that fact alone undermines his credibility at every given stage of these proceedings. And the credibility of the other witnesses, which is not undermined, can be inferred from the jury as being these police officers were pumped up for a fight, and lo and behold, they found one. And they did it because of the content of the speech of this demonstration. It's not any different than if they did it to the color of their skin back in the 1950s or the 60s, and we go back to Shuttlesworth and those sorts of ideas. You can no better look at the content of a speech of a demonstration in order to impose oppressive police tactics than you can to the color of one's skin. I find the analysis by analysis similar to the Forsyth County case, where the Supreme Court held that when the KKK wants to march through Forsyth County, Georgia, because that happens to be a place where a lot of retired civil rights leaders happen to live, and Forsyth County says, hey, you know, we need to protect these KKK guys because they're inserting themselves and there may be violence toward them, and we want to charge them more money for the police, the Supreme Court said, no, no, no, no. You can't look at the content of that speech and do anything that it will in any way suppress or inhibit future speech of that kind. And even in that instance, there was no indication that the Forsyth County, Georgia police wanted to intimidate, harass, or arrest these KKK folks. They, in fact, wanted to protect them, similarly to what Judge Kleinfeld's experience was in the past. But this particular demonstration, and remember, this particular demonstration was one of a series of annual vigils, each of which prior to this year was very peaceful without incident. There wasn't any reason. In fact, there was reason to not expect anybody to act out of line, to act illegally, or to act violently. It looks like we've got uncontradicted evidence of something flaming being thrown. Your client says she couldn't see because she had her hood up to protect her from the rain, and it blocked her view of things. There was a lighted object thrown, and Officer Herbert kicked it behind her. That's also uncontradicted. It's in the record. You know, whether or not they want to chase that suspect through a crowd... It might have been a much better judgment just to let it go, but it's not a negligence case. It's not a negligence case. But you've got to ask yourself, can a jury infer that this sort of reaction was because of an attitude toward this disfavored speech? And I think a jury could easily infer that, because the pattern of behavior of this police force from the minute they started mobilizing was to be a hostile adversary to these people based on the content of their speech. And I think those items go to the First Amendment claim, the municipal liability claim, and the failure to train, although I think the failure to train isn't the failure to train, but in fact to train to do something illegal, which is even more so. If I understand your argument right, you're saying you don't just have to infer an attempt to suppress speech because the police had a plan to deal with disorders and wore riot gear. You can infer an attempt to suppress speech because they reacted disproportionately to the flaming object. That's one in a series of a pattern of behavior that indicates a hostile, intimidating, and harassing attitude by this police force so that if you have a candlelight vigil at a church in honor of a religious holiday without a parade permit, and you won't have police going in there and arresting people, knocking people to the ground for no reason, looking for excuses to run into the crowd and knock people down. What you will have is the police walking along in a very gentle way, looking at it a different way. Let's say the mayor is allowed to use police as a hostile way for a march against his or her opponent, I mean in favor of his or her opponent. So he can use the police to behave the way they did in this instance so as to limit the amount of demonstrations against his office or in favor of his opponent or her opponent. It would be more clearly, the clients would be more clearly drawn. Does the record show that any of these officers that you're complaining about did anything at all before bushes were ignited? Well, yes. The affidavits of the five people arrested, three of whom had their charges dismissed, occurred prior to all of this. Occurred prior to there being any bushes being burned? Yes. Where would I find that? It's in the affidavits of the individuals that are included in the executive record. I think it's in each of them. Some of them only saw one of this. There was two arrests. One with three people over on one side of the street and one with two people crossing the street over here. Some of the witnesses saw both of those arrests. Some of the witnesses saw only one of them. Each of them was represented as a very extreme. And it's on the videotape that was in the record that was designated as well. These were very violent, unnecessary takedowns. Well, sure, that's their opinion. That doesn't at all answer the question I have, which is did the police lower, even for crowd control purposes, before there were burning bushes? Did the police do anything? Did they do anything before the bushes were ignited? In our opinion, the violent takedown of individuals for no reason or at best jaywalking is something that's going to scare people from participating in an event like this again, yes. Was that before or after the flaming object? Before. Violent arrests of jaywalkers before the flaming object? When I'm talking about the flaming object, mind you, I'm talking about the igniting of four or five bushes. There was an igniting of one bush that occurred after the flaming object. There were tiki torches, which the court may be mistaken. Tiki torches instead of candles that were being handled, and they saw them as flames. And I think when the crowd, when the police ran into the crowd, one of those tiki torches fell because it was knocked out of their arms by the police officers running into the crowd and landed on a bush and set the bush on fire. If you read the record, I mean, as you read the record, there are bushes alongside what's called the Holt Center, which is a large entertainment complex right where all this happened. And the police officers are on the street. The sidewalk is between the bushes and the police officers. So then when they charge the crowd, that's when those bushes got lighted on. What occurred after some unfortunate mentally disturbed individual, I'm sure, decided it was a good idea to throw a flaming object at a police officer, which no one in this room or at the demonstration would be in favor of here. Here's why I'm having I'm still having trouble drawing inferences. I'm thinking the police in, I can't remember what town this was, Eugene, probably watched television during the WTO riots in Seattle, just like the rest of the country. And I bet a lot of them would conclude that once a big crowd starts getting out of hand, you have to move in fast before you can't move in effectively anymore. I would guess that's the inference drawn by a lot of the country. Well, so once the flaming object is thrown, it's hard for me to see why their aggressive action should imply disapproval of the speech as opposed to trying to get control of the situation before they can't get control of it. Well, on the one hand, I have to comment that there's nothing in the record about WTO or any of that. It's just part of the general background. I'm saying that one reasonable police strategy might be if I'm what I'm saying is one reasonable police strategy might be and just keep an eye on things as long as everybody behaves. But as soon as they start misbehaving, any of them move in fast, because otherwise, with a big crowd like that, you won't be able to deal with it at all. Well, I guess one of the points I was trying to make about the WTO is I actually believe that this particular event occurred to at least two years prior to the WTO event. And it has a multiple year history of being a peaceful, nonviolent event. One could equally make the remark that once the police begin to exercise violence in a crowd, a crowd is going to react. And given the sequence of events, maybe that flaming object was a reaction to people being violently taken down, which is a reasonable expectation of a provocative act on part of a police force. If you go into a crowd and you act violently, the crowd is going to react as well. Do you concede that the first thing that happened before any police violence was somebody throwing the flaming object? No. These five arrests were at best jaywalking or very violent and occurred before the flaming object was thrown. And, you know, Officer Herbert acted just like, you know, a reasonable person who didn't want to get into a violent confrontation. She just picked the burning object behind her. Now the end of it. But for the chase into the crowd by these by these police officers, that would have been the end of it. Well, the police do say that the reason they gathered the particular gathering there, the officers at least say they got there because people were throwing flaming material as they walked along toward the bushes and such that occurring before this incident. Right. And that's what they said. No. And that's correct. But the five people who were arrested for. I must have misheard you in response to my question. Well, the five people who were arrested violently and brutally occurred prior to the march going by the bushes and any lighted material going to the bushes that occurred on 6th Street. They had to walk a whole block and then turn on the seventh before this incident with the fire occurred. So these violent takedowns occurred a good 10 minutes, five minutes before any of that. And I think it demonstrates a pattern of hostility. Police get there. There are a number of people carrying flaming objects, throwing them at the bushes. And then along the way, this flaming object is thrown at this officer. It's very difficult to understand how one justifies that. But that's one sequence of events reported by the police. The other sequence of events reported by other people is, yes, people were carrying tiki torches, but nobody lit any bushes on until after they charged the crowd. After the flaming object was thrown and kicked behind. What they said was they didn't see any themselves, which doesn't at all contradict the police report. I guess that would be something for a jury to infer. We have no video takes as well that were part of it doesn't contradict it. They were in the march as well. The videotapes don't show it. The videotapes show the entire march. There wasn't anything in those videotapes to indicate anyone throwing any violence, any flaming object or any bush burning on flaming object. Prior to the person throwing the object and the police charging the crowd. They were carrying these flaming tiki torches. Yes, that is true. You're saying there were bushes set on fire before the jaywalking arrests. The jaywalking arrest occurred on 6th Street. The bushes exist on 7th Street. So the jay, they were walking from 6th to 7th. You know, just I don't know if this really makes any difference. But at this point, I'm now curious as to what your response really is intended to communicate. I think what you're trying to say is the burning bushes occurred on a different street, not in a different time sequence. Both different street, different time sequence. The march moved forward from 6th to 7th. I'm not sure where we're not communicating. I don't have much time, but I'm not sure where we missed. The march was moving from 5th Street and then to 6th Street. At 6th Street, several people were taken down in a violent and brutal manner. The march moved forward to 7th Street. As it moved forward to 7th Street, it turned on to 7th Street. As it did that, somebody, some idiot threw this thing at these police. Officer Herbert kicked it behind her, and Sergeant Shadwick and his team charged the crowd. That's the sequence of events. And then when he charged the crowd, some of these tiki torches fell, and a bush or two may have gotten lit on, did get lit on fire. I'm almost 30 seconds here. Okay. I never got to the arrest part. Perhaps you want to save the 30? Yes, thank you. Mr. Mountain. Thank you, Your Honors. May it please the Court. There are three solid reasons to affirm the grant of summary judgment in this case. First of all, as Judge Kleinfeld's questions suggested, there is absolutely no proof in this case that the officer had a motive to interfere, to deter the plaintiff's exercise of her First Amendment rights. There is no evidence in the record that he opposed her political beliefs. There's no evidence that he used his official position to punish her, to deter her from the exercise of those beliefs, and that's the kind of evidence. That strikes me as your weakest argument. Pardon me? I'm sorry. Isn't that about Mumia, a free Mumia thing? And wasn't he convicted of killing a policeman? Mister, he was. He was convicted of killing a policeman seven years ago in Philadelphia. Let's leave aside motive. Let's just suppose, hypothetically, that the police are not real enthusiastic about freeing Mumia. Oh, that's true, but to prove a First Amendment violation, the plaintiff has to come forward, not unlike the plaintiff in a retaliatory firing case, has to come forward with proof of a motive on the part, in this case, of the police, just like an employer, that they were motivated, their substantial motivation was to deter the exercise of political activity. And you just can't draw that from the evidence. Can you focus a little more on whether the police engaged in any unusually aggressive arrests for unusually minor offenses before the crowd started doing anything that looked like a serious or dangerous violation of law? Yes, Your Honor, I can. And I'll try and take up the issue of the Court's questions about the sequence of the arrests and the burnings. I believe that the record demonstrates that there were arrests that did occur before the crowd turned down toward 7th Street, which is really the scene of most of the burnings, for example, the burnings of bushes and the throwing of flaming material. But here's the way that it sequences, Your Honor, is this event starts with the candlelight vigil by the jail. All of a sudden the vigil turns into a march. Your Honor, there was no permit for the march. The real problem was that there was no plan, there was no notice by the group of what the route that the marchers were now going to take. And that's why if you look at the tapes and listen to the tapes, you'll hear the officers calling this an illegal march. And it is because they hadn't filed their, quote, flight plan before it started. And as it starts, Your Honor, and starts winding its way, people, I think initially at the tail end of the line, start interfering with traffic. And so there is an arrest. That's a traffic arrest. No, at this time the crowd control team has not been called yet. It's when that arrest is made, they turn. There's another arrest in an intersection when one of the protesters comes close to getting killed or hit by a car trying to stop traffic. It's at that point an arrest is made. And now it's about that time, I think, that the crowd control team, of which defendant Shadwick is a member, a leader, is summoned. When the officer, when that team is summoned, and when you look at the videotape, you will see that they are deployed, they take up positions just standing in the street, not unlike the days of which some of us obviously are familiar. And it is at that point where the police are deployed. Fires are burning, Your Honor, in the bushes outside the Holt Center. And in there, you can see them on tape. And then you do see, all of a sudden, flaming material coming out at the officers who are standing there. And the officers do take a measured response. They do approach. Some pull back. But when the lighted material has come at the feet of one of the officers, part of the team, this is Officer Shadwick's team, does approach. And in the course of less than 60 seconds, what happens is they go after the flamethrower. The officer runs in to the plaintiff. He's unable to make his arrest. He pulls the, his arrest of the flamethrower. He pulls the plaintiff back to the, from on the other side of the sidewalk to the curb where she is taken into custody by others. That's it. That's it. And, Your Honor, there is nothing in those facts, like there's nothing in the operational plan that imparts an animus on the part of the police officer to be deterring the plaintiff from the exercise of her political beliefs. The, you know, the operational plan doesn't get them there. The whole series of events don't make the leap of logic from, you know, an unfortunate event, momentary that it was, to a constitutional violation. The, you know, you just can't get there from here. Just like you can't get there on the question of a failure. And you can't infer an intent to shut her up. Exactly. By the time the police ran into the crowd, knocked her down, and then arrested her, there are flames along the streets and a flaming object has been thrown. That's correct, Your Honor. And like I say, that happens after the parade has started, after Officer Chadwick is summoned, after he's deployed, after he's standing there in line, and then only after flying burning material comes out of the crowd. There's a measured response when they spot the suspect and they're going after him. Again, I'll say it, it's in 60 seconds. It's one of those classic police activities where the court, in a sense, doesn't make, has said it won't second-guess a split-second decision by a police officer under circumstances like that. You know, there's no proof on the failure to train claim. There's no proof, one of a failure to train, but no proof of failure to train on a constitutional dimension. The failure to train has to exhibit a policy of, you know, deliberate indifference to the constitutional violations that allegedly occurred. It doesn't, the backstone to that, the operational plan, in fact, does the opposite. It demonstrates that the police department and the city were taking careful steps. They were plotting this out. They were trying to reduce the chances for things getting out of hand. And I, well, I'm thinking of it, and this, you know, I think the record reflects that this activity occurred after the WTO problems in Seattle. And I say that because when you listen to the tapes, you'll see a couple of the demonstrators walk, and you'll hear one guy say, close enough to the microphone, Seattle in 99 all the time. That's, you know, he can say that, that's fine, but he can't start throwing flaming material at the police officers while bushes are burning outside the civic center. The, so, you know, if anything, the failure to train, there is just no basis for it, but certainly not on a constitutional dimension. What there is in this case is evidence construed in the light most favorable to the plaintiff that establishes that the police officers, police officer Shadwick, had a reasonable belief that he had probable cause to make an arrest for resisting arrest. I mean, the circumstances we've described, it has been conceded that flaming material was being thrown at the police officers. It has been conceded that the police officers went into the crowd to chase the flamethrower. It's unfortunate that a collision occurred, but it's not unreasonable for the police officer to believe that the marcher, the plaintiff, was interfering with his attempt to arrest. And the fact that the plaintiff says, you know, I was just standing there. I didn't try and get in his way. That's, take it as fact, you know, but it doesn't do me any good. Those could be true. She could be not seeing much because of her hood and the rain and not paying attention, but the police could be seeing and thinking, why is that woman blocking me? Well, and, you know, the plaintiff chides the district court for kind of buttressing that conclusion with testimony of the plaintiff in her deposition where she said, well, I talked to another marcher and he said that he might have pushed me into the police officer. And he also said, this other marcher, said that he was trying to ward off the police officer, that he put his hands up and he had a something, some kind of baton-like object. And the plaintiff says, well, geez, you know, that's hearsay and it shouldn't be considered. Well, the plaintiff said it. If it's hearsay, it's testimony about, if you're looking at this gentleman's statement, that's against his penal interest and it's certainly against hers in presenting it because it makes the case for resisting arrest. So, you know, the fact is what the proof does show is that the officer is entitled to immunity here. And once that's established, the rest of this case falls like the house of cards that the district court correctly characterized it as. Now, one last point. The defendant says that we're wrong in our respondent's brief when we say that he's no longer appealing his state law claims. We said that because in his brief, or in the plaintiff's brief, says, lists the issues on appeal as the court's rules require. And he lists three issues that relate to three of the constitutional claims. We took that to say that, well, those separate numbered claims or state tort claims, you know, are out of this case. So, I mean, that's why we did it. That's why we didn't brief him. But we would stand on the district court's analysis of those claims. I have one last point of information. Candor compels me to say three years after this event in 2003, the Oregon Supreme Court held unconstitutional as vague and overbroad the disorderly conduct statute for congregating but violating a lawful order to disperse. It has no play in this case. It wasn't raised ever in the case. But candor compels me to say that that is the law in Oregon. Okay. I think we have no further questions. Thank you. Thank you. Thank you. Mr. Michaels? Is it correct for us to believe that you folks do have the designated record and you can watch these videotapes? We have the record. You know, it's interesting to me that he says that the city says, well, we organize this mobile police force to make sure things don't get out of hand when things never had gotten out of hand in any of the years prior. Clearly trying to assist somebody who has been convicted of killing a police officer is a hostile act to most police officers. I would refer you to supplemental excerpt of records submitted by defendants, page 50, and because of the multiple page deposition, pages 169 to 171, where Officer Shadwick describes what he's doing when he runs through this crowd. I just think it's just unbelievable to think if you run into a crowd and you knock someone down, it's more likely their fault than yours. I just find that just unbelievable. Thank you. I understand the position. The matter just argued will be submitted and will be sent in recess for debate.
judges: Fernandez, Rymer, Kleinfeld